# Exhibit 1

**Broker Agreement**

This Broker Agreement, dated as of 2/1/2022 (the "Effective Date") (the "Agreement"), is entered into by and between Creative Consumer Products, Inc., (d.b.a Dionis) a Pennsylvania corporation having its principal place of business at 1993 County Line Road Warrington, PA 18976 ("Supplier"), and Doema Inc. DBA The Lion Group ("Lion Group") its principal place of business Oceanside, NY ("Broker", and together with Supplier, the "Parties", and each, a "Party").

WHEREAS, Supplier wishes to engage Broker as the exclusive seller on Amazon.com of Dionis Goat Milk Skincare products, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, intending to be legally bound, the Parties agree as follows:

1.    Definitions. Capitalized terms have the meanings set forth or referred to in this Section, or in the Section in which they first appear in this Agreement.

"Excluded Seller" means third party websites/accounts not listed in this agreement Schedule 5

"Products" means those products that are identified in Schedule 1, as Supplier may amend in its sole discretion from time to time.

"Purchase Orders" means a contract entered into between the Supplier and a Seller for the sale of Products in the Territory identified in Schedule 5.

"Broker" has the meaning set forth in the preamble of this Agreement.

"Supplier" has the meaning set forth in the preamble of this Agreement.

"Supplier's Intellectual Property Rights" means all intellectual property rights owned by or licensed to Supplier.

"Term" has the meaning set forth in Section 7.1.

"Territory" means such area as designated on Schedule 5 hereto.

2.    Appointment as Broker.

2.1    Appointment. Supplier hereby appoints Broker, and Broker accepts such appointment, to act as an independent seller of Dionis Products to sell in Territory during the Term, solely in accordance with the terms and conditions of this Agreement. In the event Broker desires to sell any products competitive with those Products offered by Supplier, then Broker shall so notify Supplier in writing before doing so, whereupon Supplier shall have the right to terminate this Agreement.

2.2    Excluded Sellers. Notwithstanding Section 2.1, Supplier does not appoint Broker as a Broker for the Excluded Sellers. Broker shall not sell to or on any platform from Excluded Sellers without written approval from the Supplier.

2.3    Status as Broker:  Broker is an independent seller pursuant to this Agreement. Nothing in this Agreement creates any agency, joint venture, partnership, or other form of joint enterprise, employment, or fiduciary relationship between the Parties or an employee/employer relationship. Neither Party has any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement, or undertaking with any

91192200.v3

Seller or other Seller. The operations of the Broker are subject to the sole control of Broker. All Personnel of Broker are employees or Representatives of the Broker and not of Supplier. Broker shall be solely responsible for any and all costs or expenses that it may incur in the performance of its obligations hereunder.

3.    General Broker Obligations.

3.1    Market the Products. Broker shall market, advertise, promote, and solicit the sale of the Products to agreed Territory in schedule 5, using the advertising and marketing materials and programs supplied or approved by Supplier. Without limiting the generality of the foregoing, Broker shall:

(a)    initiate and attend sales calls and meetings with Sellers;

(b)    develop and execute a sales and marketing plan sufficient to fulfill its obligations under this Agreement;

(c)    update storefront and product catalog to include all items as directed by the Supplier.

(d)    as directed by Supplier, market, advertise, promote and solicit the sale of the Products and conduct business in a manner that reflects favorably at all times on the Products and the good name, goodwill, and reputation of Supplier;

(e)    promptly notify Supplier of, and provide, upon Supplier's reasonable request, reasonable assistance to Supplier to address and investigate, any complaint or adverse claim about any Product or its use of which Broker becomes aware; provided that all such notices required hereunder shall be provided to Supplier within forty-eight (48) hours of Broker's becoming aware of such complaint or claim;

3.2    Pricing; Credit

(a)    In the performance of Broker's obligations hereunder, Broker shall not advertise, market, or otherwise promote any Products other than at the applicable prices identified in Schedule 2, as Supplier may amend in its sole discretion from time to time. For clarification purposes only, Broker shall not advertise, market, or otherwise promote any Products at a discount to, or in excess of, the applicable prices identified in Schedule 2, as Supplier may amend in its sole discretion from time to time.

3.3    Prohibited Acts. Notwithstanding anything to the contrary in this Agreement, neither Broker nor its Personnel shall directly or indirectly:

(a)    make any representations, warranties, guarantees, indemnities, similar claims, or other commitments:

(i)    actually, apparently, or ostensibly on behalf of Supplier, or

(ii)    to any Seller with respect to the Products, which representations, warranties, guarantees, indemnities, similar claims, or other commitments are additional to or inconsistent with any then-existing representations, warranties, guarantees, indemnities, similar claims, or other commitments in this Agreement or any written documentation provided by Supplier to Seller;

2

91192200.v3

(b)     engage in any unfair, anti-competitive, misleading, or deceptive practices respecting the Products, including any product disparagement;

(c)     sell, market, advertise, promote, solicit the sale of, or offer to sell any goods that compete with the Products; or

(d)     consult with or provide services for any person or entity that manufacturers, produces, or otherwise makes available for sale or distribution goods that compete with the Products.

3.4    New Accounts. Prior to marketing, promoting, or soliciting the sale of the Products through accounts not listed in Schedule 5, or through market segments in which Supplier is not currently selling or distributing Products, or any other party designated by Supplier as a "account," Broker shall obtain the written consent of Supplier that expressly authorizes Broker to so commence marketing, promoting, or soliciting the sale of the Products.

4.    Purchase Orders.

4.1    Purchase Orders. All purchase orders received by Supplier from Broker are subject to approval, rejection or request for modification by Supplier.

4.2  Supplier's Discretion to Accept or Reject Broker Purchase Orders. Supplier reserves the right, in its sole discretion, to: (a) accept, or decline to accept, any purchase order for Products by Broker; (b) cancel, terminate, or modify any Purchase Contract previously accepted by Supplier; or (c) negotiate any terms and conditions of the Purchase Contract with Seller, including modifying the purchase price or payment terms.

4.3    Availability of Products. Supplier may, in its sole discretion: (a) discontinue the sale of the Products without advance written Notice thereof; (b) reduce or allocate its inventory of Products; and (c) effect changes to any of the Products or parts/accessories thereto (except where continued availability is required by law).

4.4    Invoices: Supplier will invoice Broker for all orders upon shipping for payment required within the agreed payment terms. Supplier reserves the right to hold future orders or stop selling to Broker due to past due invoices.

4.5    Shipping Terms:  Shipping terms are FOB:  Warrington, PA for all orders. Broker may arrange pickup otherwise Seller will utilize their own choice of carrier to ship and charge freight.

4.6    Routing/Shipping: Supplier and Broker to review and agree to Broker Routing guide prior to shipping first order.

4.7    Damages/Returns:  Broker will comply with Supplier's Damage and return policy as follows:  Damages and defective product must be reported within 5 days of receipt of shipment.  Returns that are not defective will be charged a 20% restocking fee and freight charges will be borne by the Broker. Merchandise must be returned new. Returns are accepted within 5 days of receipt of goods and must be pre-authorized by CCP/Dionis. Any unauthorized return will be subject to a 50% restocking fee, plus freight including refused or undeliverable goods.

4.8    Order Discrepancy:  Broker will communicate any order discrepancy received within 5 days of receipt of shipment.

3

91192200.v3

5.    Compliance with Laws. Broker shall at all times comply with all laws. Without limiting the generality of the foregoing, Broker shall not engage in any activity or transaction involving the Products, by way of marketing, promotion, advertising, the solicitation of the sale, lease, use, or otherwise, that violates any law.

6.    Intellectual Property Rights.

6.1    Ownership. Broker acknowledges and agrees that: (a) any and all Supplier's Intellectual Property Rights are the sole and exclusive property of Supplier or its licensors; (b) Broker shall not acquire any ownership interest in any of Supplier's Intellectual Property Rights under this Agreement; (c) any goodwill derived from the use by Broker of Supplier's Intellectual Property Rights inures to the benefit of Supplier; (d) if Broker acquires any Intellectual Property Rights in or relating to any Product purchased under this Agreement (including any rights in any Trademarks, derivative works or patent improvements relating thereto), by operation of law, or otherwise, such rights are deemed and are hereby irrevocably assigned to Supplier or its licensors, as the case may be, without further action by either of the Parties; and (e) Broker shall use Supplier's Intellectual Property Rights solely for the purposes of performing its obligations under this Agreement and only in accordance with this Agreement and the instructions of Supplier.

7.    Term; Termination.

7.1    Term. The term of this Agreement shall commence on the Effective Date and shall terminate thirty (30) days after either party provides written notice of termination to the other, unless earlier terminated as provided under this Agreement (the "Term").

7.2    Supplier's Right to Terminate. Supplier may terminate this Agreement immediately by providing written Notice to Broker:

(a)    if Broker breaches any material provision of this Agreement;

(b)    if Broker becomes insolvent or files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency Law, makes or seeks to make a general assignment for the benefit of its creditors or applies for, or consents to, the appointment of a trustee, receiver, or custodian for a substantial part of its property, or is generally unable to pay its debts as they become due; or

(c)    if Broker sells, transfers or disposes of all or substantially all of its assets, or merges or consolidates with any other entity.

Any termination under this Section will be effective on the Broker's receipt of the Supplier's written Notice of termination or such later date (if any) set forth in such Notice.

7.3    Effect of Expiration or Termination.

(a)    Upon the expiration or earlier termination of this Agreement, Broker shall promptly: (i) cease to represent itself as Supplier's authorized Broker with respect to the Products, and shall otherwise desist from all conduct or representations that might lead the public to believe that Broker is authorized by Supplier to market, promote or solicit sales of the Products; (ii) return to Supplier all documents and tangible materials (and any copies) containing, reflecting, incorporating, or based on Supplier's confidential information; (iii) permanently erase all of Supplier's confidential information from

4

91192200.v3

its computer systems; and (iv) certify in writing to Supplier that it has complied with the requirements of this clause.

8.    Confidentiality.

8.1    Scope of Confidential Information. From time to time during the Term, Supplier (as the "Disclosing Party") may disclose or make available to Broker (as the "Receiving Party") information about its business affairs, goods and services, forecasts, confidential information, and materials comprising or relating to Intellectual Property Rights, trade secrets, third-party confidential information, and other sensitive or proprietary information, as well as the terms of this Agreement, whether orally or in written, electronic, or other form or media, and whether or not marked, designated, or otherwise identified as "confidential" (collectively, "Confidential Information").

8.2    Protection of Confidential Information. The Receiving Party shall, for five (5) years from receipt of such Confidential Information: (a) protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care; (b) not use the Disclosing Party's Confidential Information, or permit it to be accessed or used, for any purpose other than to exercise its rights or perform its obligations under this Agreement; and (c) not disclose any such Confidential Information to any Person, except to the Receiving Party's Representatives who need to know the Confidential Information to assist the Receiving Party, or act on its behalf, to exercise its rights or perform its obligations under this Agreement.

9.    Indemnification. Broker shall indemnify, hold harmless, and defend the Supplier and its officers, directors, managers, shareholders, members, partners, employees, agents, affiliates, successors, and permitted assigns against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement, and the cost of pursuing any insurance providers, incurred by Supplier (collectively, "Losses"), relating to, arising out of or resulting from any third-party claim alleging: (a) breach or non-fulfillment of any material representation, warranty, or covenant of this Agreement by Broker; (b) any negligent or more culpable act or omission of Broker; or (c) any bodily injury, death of any Person or damage to real or tangible personal property caused by the negligent or willful acts or omissions of Broker.

10.    Non-solicitation. During the Term and for a period of twenty-four (24) months thereafter, Broker shall not, and shall not permit its representatives to, directly or indirectly, in any manner: (a) make any solicitation to employ the Supplier's personnel without written consent of Supplier to be given or withheld in Supplier's sole discretion; or (ii) solicit or entice, or attempt to solicit or entice, any clients or Sellers of the Supplier or potential clients or Sellers of the Company (including, without limitation, any Sellers or prospective Sellers) for purpose of diverting their business or services from the Supplier.

11.    Miscellaneous.

11.1    Entire Agreement.  This Agreement, including and together with all exhibits, schedules, attachments and appendices, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

11.2    Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability does not affect any other

5

91192200.v3

term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal, or unenforceable, the court shall modify this Agreement to effect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

11.3    Equitable Remedies. Broker acknowledges and agrees that a breach or threatened breach by Broker of any of its obligations under this Agreement would give rise to irreparable harm to Supplier for which monetary damages would not be an adequate remedy and in the event of a breach or a threatened breach by Broker of any such obligations, Supplier shall be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction, without any requirement to post a bond or other security, and without any requirement to prove actual damages or that monetary damages will not afford an adequate remedy.

11.4    Assignment. Broker may not assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of Supplier. This Agreement is otherwise binding on and inures to the benefit of the Parties and their respective permitted successors and permitted assigns.

11.5    Choice of Law. This Agreement, including all exhibits, schedules, attachments, and appendices attached hereto and thereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the Laws of the Commonwealth of Pennsylvania, without regard to the conflict of laws provisions thereof.

11.6    Choice of Forum. Each Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all exhibits, schedules, attachments, and appendices attached hereto and thereto, and all contemplated transactions, including contract, equity, tort, fraud, and statutory claims, in any forum other than the United States District Court for the Eastern District of Pennsylvania or, if such court does not have subject matter jurisdiction, the courts of the Commonwealth of Pennsylvania sitting in Bucks County, Pennsylvania, and any appellate court from any thereof. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts.

11.7    Waiver of Jury Trial. Each Party acknowledges and agrees that any controversy that may arise under this Agreement, including any exhibits, schedules, attachments, and appendices attached to this Agreement, is likely to involve complicated and difficult issues and, therefore, each such Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement, including any exhibits, schedules, attachments, and appendices attached to this Agreement, or the transactions contemplated hereby.

11.8    Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

11.9    Broker Deliverables. Immediately upon execution of this Agreement, Broker shall deliver to Supplier the materials identified on Schedule 6 hereto.

6

91192200.v3

[Remainder of page intentionally blank; Signatures to follow]

7

91192200.v3

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound hereby, have executed this Agreement as of the Effective Date.

**SUPPLIER:**

CREATIVE CONSUMER PRODUCTS, INC.

By: *Karen Minsky*

Name: Karen Minsky
Title: Vice President, Sales & Operations

**BROKER:**

_____

By: _____
Name:
Title:

8

91192200.v3